Judges of the U.S. Court of Appeals for the Second Circuit. Hear ye, hear ye, hear ye. All forces have a business before this. A stated term of the U.S. Court of Appeals for the Second Circuit. Draw near, give your attention, and ye shall be heard. Please be seated. Good morning. So this is the first of two calendars for today. At the conclusion of the argument on the present calendar, this panel will adjourn and another constituted panel will return to hear argument in the appeals on the next calendar for today. I understand the counsel of the case on the first calendar are present, so we'll hear argument right away in Connecticut Children's Medical Center, the Continental Casualty Company, 22322. Thank you. Good morning, Your Honor. I represent Connecticut Children's Medical Center, a children's hospital with subsidiary medical groups in the state of Connecticut. Since the district court granted the insurer's motion to dismiss, the Connecticut Supreme Court, as you know, has spoken to issues related to business interruption losses arising out of COVID-19. And that was in the Connecticut dermatology case. The Connecticut Supreme Court stated that, and I quote, in ordinary usage, the phrase direct physical loss of clearly and unambiguously means that there must be physical alteration to or deprivation of the property that renders it physically unusable or inaccessible. The Connecticut Supreme Court went on to hold that there was no coverage in that case, that's the Connecticut dermatology case, as there had been no physical transformation in its view with regard to the property. In that case, there was no claim for the presence of the virus within the properties. No, but it did go on to say, counsel, that even if the plaintiffs had claimed that their properties were actually contaminated by the coronavirus, we find persuasive the cases that have held that the virus is not the type of physical contaminant that creates the risk of a direct physical loss, because once a contaminated surface is cleaned or simply left alone, it no longer poses any physical threat to occupants. That's correct, Your Honor. So doesn't that foreclose this argument? No, Your Honor, because in the case below, no claim was made as to physical alteration of the air. In Connecticut, there's a Connecticut general statute. So if we were to certify this question, do you think that the answer would come back differently? Yes, I do, Your Honor. You do? I do, and I think we can find the clue to that in the cases contained within Connecticut dermatology. So you think that they would say, we are wrong when we said in Connecticut dermatology, even if the plaintiffs had claimed, and on and on? Your Honor, for example, if I could. No, no, no, please answer my question. They would not have to say they were wrong. It would be consistent with what they said in the decision itself, because in the decision itself, it noted that you could have a loss without tangible alteration to the property itself, to the structure. And it cited to such things as E. coli, bacteria, ammonia, friable asbestos. It cited to the Kim Gee case, which in turn found that you could have a transformation and a loss of the property without structural damage. Wasn't there a distinction, though, because once one decontaminated for COVID, it was then usable? Isn't that like a primary distinction between this and some of the other things mentioned? It's not permanent. It may not be permanent in a restaurant. It may not be permanent in a retail store. But in a hospital treating COVID-19 patients who are residential in nature, you have an ongoing contamination taking place, and you have an ongoing contamination. I mean, presumably hospitals have lots of diseases that are there and ongoing need to take measures and address them. Would the flu present a claim under this policy? Right. And what's the distinction? We have not seen in this world or society anything like the COVID-19 pandemic since the Spanish flu. The flu itself is something we deal with day in, day out, year round. That's not the unique situation presented by the policy. So it's the degree of contamination? What's the distinction? It's the degree of contagiousness of the virus, Your Honor, that affects patients and therefore creates risks that are extreme in this setting. And because of the residential nature of the patients who are creating those risks, you have ongoing contamination into the air. Well, I feel like this is kind of collapsing onto your air argument, which I must confess I find a little overstating of what the law is. My understanding is that real property includes spaces that may be filled with air, not the actual air. And so that means that assuming even if we were going to, that the hospital was part of the covered property, don't we foreclose that because this is not persistent, because it can be contaminated in a number of ways. It can be cleaned. And that would, the fact that the air can be cleaned and the fact that the surface area can be cleaned, I think squarely puts it in within Connecticut dermatology. Your Honor, with all due respect, the Connecticut General Statute that includes air as part of the real property, and it's the real property aspect of it. Right, so that's the spaces that may be filled with air, which I think is part of the argument you were making earlier. And water. And the CNA policy excludes water but does not exclude air. And I also want to make this point before my time runs out. Capstone, Your Honor, defines property damage specifically as related to the structures. The CNA policy did not, it defined the insured covered property as real property consistent with the Connecticut General Statute, which in turn includes air as part of the real property. You've reserved, I see, one and a half minutes of rebuttal. I've not seen that on my time as judge. The last time I was here, Your Honor, and I had some trouble getting there, but I got there. All right, we'll hear you in eight minutes. Yes, thank you, Your Honor. Or less. Good morning. Thank you, Judge Leahy. Kenneth Chambegan with Paul Eisner, Appalachian Continental Casualty and CNA. May I please the court. This case presents the now familiar question of whether claims seeking to recover business losses from the stay-at-home orders issued in the wake of COVID-19 fall within the scope of provisions commonly found in property insurance policies. I really just want to make a couple of points this morning in defense of the district court's decision, which we believe was correct. First, with regard to the business interruption and extra expense claims, it is now clear in the wake of Connecticut Dermatology Group that Connecticut Children's failed to allege physical loss of or damage to property. And really, the only argument that Connecticut Children's is making now in an effort to distinguish Connecticut Dermatology is the argument that we heard from my friend, Mr. Danaher, this morning. Namely, the argument that this case is somehow different because there were allegations of the presence of the COVID-19 virus. But don't they also have the disease contamination provision? They do. I'd be happy to turn to that as well. That's an important difference, I think. Yes, and I would certainly acknowledge that that provision is not controlled by Connecticut Dermatology Group. And I'm happy to turn to that language now or to turn to it later, whatever you would prefer. You're here. Why not? Well, let me go right to it since you asked about it. With regard to the disease contamination claim, our fundamental submission is simply that Connecticut Children's failed to allege that it was ordered to evacuate or decontaminate the location. And again, the language of the provision says that the order must constitute an evacuation or decontamination order at a covered location. Now, the orders issued by Governor Lamont are found in the Joint Appendix at pages 169 to 174. And none of those orders even mentions evacuation or decontamination, much less mandate it at the specific location belonging to Connecticut Children's. Could I ask you, Counsel, about that second factor, which you just delineated, which was one of the two grounds upon which the district court concluded. It depends a little bit on what the meaning of at is. It seems to me that there's at least some ambiguity on that factor as to whether we're talking about directed at a specific location, or couldn't it also be applicable at a given location? And if it could sustain the meaning of the latter, then could you continue to rely on that aspect of the district court's decision? So, as you say, Judge Nathan, Judge Meyers' decision rested on both of those grounds. And I'd really be content to rest on and stop on the first one, which is that you do have to have an evacuation or decontamination order. And in our view, consistent with all of the courts of which we are aware that have addressed the issue, that really requires an order requiring evacuation or decontamination, which is to say mere guidance as to what you might do, what might be best practices would be insufficient. I'm just feeling like we're being a little bit circular, and we want to get this right. So part of the reason why Connecticut dermatology applies is because it can be decontaminated. And so now we're saying that it either needs to have a mandatory evacuation or a decontamination. And I'm wondering what happens if we believe that the language is ambiguous as to whether or not there needs to be a governmental order mandating an evacuation. How does that change your position? I think at that point, I would have to just respectfully disagree. And I do think that the courts that have considered this issue have said that language or materially identical language is unambiguous. We obviously point to the Fifth Circuit's decision in the PS business management case. There are also district court decisions to the same— But it doesn't have the same language as PS does. The language is slightly different, I would grant you. But I think it is materially identical because, again, for something to be in order— If the language is different, how can it be— Well, I think it has the same meaning, even though I would acknowledge that the language is different. And that's for the simple reason that we think that the plain meaning of order is something that requires or mandates taking a particular action. Now, to finish my answer to Judge Nathan on the second part of this, I do think that the better reading of the provision is that the order has to be directed to the location. And I would note that the policy contains a very specific definition of location. It's at Joint Appendix 73, it defines a location as, quote, the area within legal boundaries of the premises or of the portion of the premises in which the insured has an interest. Yeah, although I'm not sure that, again, if you accept—and maybe you don't— but if you accept that the meaning here could be either directed at or applicable at, the definition of location I don't think changes that potential meaning. And I think I would acknowledge that if you had an order sent from Governor Lamont saying, you know, every hospital in, say, New Haven, Connecticut must be evacuated, that there could be an argument that that qualifies. In other words, the mere fact that it isn't an order directed solely at one hospital may not be of any moment. But really, the critical takeaway here, and I would urge the Court to look at these orders, is that these orders come nowhere near directing the evacuation or decontamination of hospitals. All the orders—go ahead. All I was going to say is that all the orders say is that the hospitals are, in fact, essential facilities. And while the hospitals may have engaged in cleaning and other activities, and I'm not sure that that would even rise to the level of decontamination, it didn't do so in the face of a government order. And that's really the critical point. And again, the point that every court that has considered a disease contamination provision has accepted. Well, you're asking us to look at both the orders and the allegations, correct? Correct. I don't think the allegations really say anything beyond the orders and the orders were attached. Certainly, in this case, there's not only the complaint. There's also the Rule 56A1 statement that was submitted by Connecticut Children's in support of its motion for partial summary judgment. And neither the orders from Guzman or Lamont nor the guidance from the CDC or other public health authorities, again, requires evacuation or decontamination. And the last thing I would say with regard to the business interruption or extra expense claims is simply that to the extent that Connecticut Children's' argument here turns simply on the allegation of presence of the COVID-19 virus, for the reasons that Judge Nathan indicated in her apology with my friend Mr. Danaher, I do think that the Connecticut Dermatology Group decision contemplated this argument and really rejected it. Could I just ask, do you think there's any limit to that? Do you think that case would cut off all claims of physical damage to property based on COVID-19? Is there any set of allegations or record facts that could allow a basis for distinction? I'm not aware of one in the cases that we have seen. And I think that that's for the simple reason that in that paragraph that you were quoting from, I think that the court made quite clear that the allegation of mere presence is not enough in and of itself. The presence has to cause the loss as defined by the Connecticut Supreme Court in the decision. And so, you know, is there a possibility in which the presence of some virus could cause a loss perhaps? But again, in the context of COVID-19, because of the nature of the COVID-19 virus, and as the Connecticut Supreme Court said, what is distinctive about this virus is that it is essentially evanescent, that it exists on surfaces for some period of time and then goes away. It can be removed through simple cleaning. You know, those are features of COVID-19 that other contaminants such as mold and others do not necessarily share. Just a quick question. Are you aware of any real-life examples with respect to the direct disease contamination coverage where a hospital received insurance pursuant to that type of coverage? I'm not aware of sort of the complete set of circumstances under which claims have been sustained under that provision. But I think an example might be something like, say, Legionnaires' disease, which is the sort of paradigmatic example of a situation where there could easily be a public health order to essentially, you know, shut down the facility and take steps to decontaminate, which as I understand it would require, you know, changes to the ventilation system and so forth. Can I ask, what are we supposed to make of 2B that doesn't include the, I'm sorry, and the disease contamination coverage that doesn't include the if required by the governmental authority when 2A does? What's the negative in 2B? I mean, it would seem to me if they were both if required by the government authority, they would have either not put it at all in A or put it in A and B. But maybe something is different about a decontamination. And, again, my trouble is that if we're arguing that the reason that the loss is not permanent is because it can be decontaminated, then doesn't that, you know, it seems to me, explain to me why you don't want it third place. Well, sure. So just to be clear, we're looking at the language on Joint Appendix 84 in the disease contamination provision. And as I read that language, the evacuation or decontamination order is, you know, kind of a conditioned precedent at the beginning of the provision. So, in other words, if you look at the language at the beginning of A, if as a result of an evacuation or decontamination, the following steps are taken. Well, that would make sense, except for they felt the need to add it again in A. And they didn't add it in B. And we're supposed to construe things against the insurer. I'm just wondering, doesn't B require the applicability of A? Yes. Well, it requires the condition at the beginning of the first A to be satisfied. And I would note, Judge Perez, I think the explanation for the if required by the governmental authority at the end of A to A is simply that the evacuation itself has to be commanded by the order. So, in other words, if you had a decontamination order rather than an evacuation order. So, you don't, right. But then you evacuated, then you would not. I'm sorry, but the decontamination order doesn't have to be required? No, there would still have to be an evacuation or decontamination order regardless, because that's necessary in order to trigger the entire provision. My point was simply that to the extent that you were trying to recover under A to A for evacuation. What about A to B? What about A to B? That's what we're focusing on. Well, you would be able to recover for decontamination or disposal if there is an evacuation or decontamination order. So, that's, I think, the difference. But I think everyone recognizes that you have to have that for any of this provision to apply. That's the overarching condition. Correct. So, in other words, that limitation, in essence, says you can recover for evacuation, but only if evacuation itself is ordered. Thank you very much. Great. Thank you, Your Honors. Counsel, you've got your minute and a half. I'd like to return to the issue of damage to the air, alteration of the air in absence of structural damage, and refer to the Kinetic Dermatology case where it cites Ken Chi, and it specifically says that, recognizes that unlike cases, this is from Ken Chi, unlike cases of gasoline infiltration, catnip, odor it means, red dust and other noxious substances the courts have found to constitute direct physical losses, there is no allegation of persistent contamination here. It is recognizing that it sees a distinction between a situation where there is persistent contamination of a structure and such types of contamination as are found and listed in Ken Chi. But it's distinguishing COVID-19, so I'm confounded by your... Well, what I was asked earlier was whether or not the Connecticut Supreme Court would take a look at this case and find in favor of our argument on alteration of the air. And I give that to you in response to that. Second thing with regard to the order regarding decontamination, there is a standing order. It's found in OSHA in the General Duty Clause Section 5A1, which means, for example, Connecticut Children's Medical Center must provide a safe environment for its employees, otherwise it runs risk for fines under OSHA. Did you make this argument? We did. Okay. It's actually alleged in the complaint you're on. But you're saying that's a standing order unrelated to COVID. Yes, ma'am. So no matter what, you've got a claim for any compliance with that order? No, it would be a decontamination issue that I'm talking about. Thank you very much. That concludes this argument calendar. And I'll ask the courtroom deputy to adjourn the court. Thank you. Court is under recess. I'm not nervous, sir. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Questions for you. I'm assuming from the calendar that the first two were being argued together, and the second 10 minutes on the third appeal? Correct. So the first is attending the court, and the second is back in the calendar. Correct. If you could start off with your viewpoint as to what is still alive in at least 21-2647 and 22-204. The issue of compensatory education, like Councilman mentioned, I think that would be the issue. If the court were to reverse, that would be an available remedy. Obviously, immediate placement, at this point, I think it would be moved regardless of whether there was a change in placement, just by the passage of time, because we're talking about the circumstances in 2015, 16, 17, and 18, and we're sitting here in 2023. So, we can't turn back the clock five years, 18 is five years older, so his placement recommendation currently is based on his current circumstances. So, really, I think the only issue would be the IDEA claims as to those years and whether any compensatory education was owed. If there were a violation, then if it— Okay. So, go ahead with your argument. I just want to make sure there's—I'm going to narrow the issues of dispute. Okay. Now, as far as the enrollment issue, to go chronologically, the idea that Aiden was denied enrollment is not factually accurate, per the record. He was, at all times, enrolled in a public school district. He was a Remsenburg student. One of the—it may be a peculiarity to the east end of Long Island, I'm not aware of other areas that has this, but there are a lot of single school districts on the east end of Long Island, one of which is Remsenburg's beyond, where the elementary school itself is its own independent school district and then transfers students to other school districts as they go into middle and high school, which is what Dick Warren was describing. So, when he was— Isn't it the case that once you finish at Remsenburg, for all students, parents can choose to enroll in either West Hampton or Eastport, correct? Yes. Because he was denied that enrollment in West Hampton. Not by West Hampton. By— That's what happened. He was enrolled in Remsenburg. He wanted to go to West Hampton Middle School, but they were recommending that he be in a contained special education class. I mean, we don't need to get into the details, but it's— The CSE at Remsenburg. The CSE at Remsenburg going up into middle school— Which is his home district. They were recommending that he be in a self-contained special education class. To accommodate the parents, they did reach out, and they would reach out to all the local districts to see what classes are available, but West Hampton Beach did not have a class that would meet his needs whatsoever. What do we do with IHO Litterman's finding, though, that West Hampton failed to enroll them? They corrected him. I'm sorry, what do you mean they corrected him? They enrolled him, right? They enrolled him. The IHO Litterman's finding reads harsher than the actual facts when you get into the record, but there was— Remsenburg Spionk, ministerially, they send a list. Here's our students that are enrolling in West Hampton Beach. Here's our students that are enrolled in Eastport South Matter. Mr. Kaloran was not on that list. This was not a— It wasn't that West Hampton Beach said, we're rejecting your enrollment. Remsenburg Spionk, at the time, because, granted, West Hampton Beach was saying, we don't have that type of special education class, so they weren't an option. They were recommending that he be placed in Eastport South Matter. So they did not enroll him in West Hampton Beach because they were encouraging him to enroll or transfer into Eastport South Matter, where they were recommending that he attend. So that's what happened with his initial enrollment, and then in response to— West Hampton Beach tried to intervene into the administrative proceedings because they're being talked about, and they were denied. Remsenburg took the position that this has nothing to do with West Hampton Beach. We're not recommending them. They have no responsibility to the student. They had no participation at all in this process. As part of the settlement between the Kalorans and Remsenburg, they agreed to make a request that for the next year's budget, they're not allowed— The Department of Education opined on this and said, you can't create a one-student class. You're not allowed to do that. But in theory, they could create an eight-person class, knowing that there was only one child that would be interested in it. And so Remsenburg reached out and asked if they would do that. Completely discretionary. They're under no obligation to create a new special education class specifically for one student. And West Hampton Beach said, no, we're not creating this new class. So he stayed over an additional year in Remsenburg. The same exact—a year passed, and the same exact thing happened. So they were, again, recommending the E-Sports South Matter, which is—one's a very small school district, one's a very large school district. If you have an interest in sports or if you have special needs where they have a developed special education program, you would want to go typically to the larger district, which is what has happened. So the idea that there's been this historic outsourcing is not the case. It's just a—you're dealing with small elementary schools. So the idea that not that many children, statistically, are in this category. So it's just a situation where West Hampton Beach had not had a cohort of students that required this type of class, or they would come up one at a time where they would then go to a neighboring school district that had a group of students. Wasn't part of the challenge the parents raised that it wasn't—they didn't think he should be in an entirely self-contained class? They wanted him mainstreamed as well. How did that debate factor into this? They—it wasn't exactly mainstream. What the parents were requesting, and Mr. Gloren can address this on rebuttal, but it was something—they called it a hybrid program because there's really no dispute that he could be mainstreamed. You're talking about a student going into middle school, learning to count to ten and write the alphabet. So it's not something where he could sit in a seventh or eighth grade class and actually participate in the lesson. It's not a matter of extra time for tests or a hearing aid or any sort of accommodation that could have him participate in the lessons the students were doing. But didn't the parents specifically ask that he be mainstreamed? And your client's response was, well, to mainstream him is in essence to put him in a self-contained class because of the level of function that you just described. So is it accurate to say that they weren't in fact asking for mainstreaming in a traditional sense? They were not asking for mainstreaming in a traditional sense. They had Dr. Feeley, an expert, come in with a proposed—like a hypothetical cutting-edge program to try out. That is not what any school in New York State does. They had an idea. Maybe it's a good idea. Maybe it's not a good idea. I'm not an educational expert. But the people that are qualified said this is not a good idea. And that is—we have to defer to their expertise. The pertinent statute, looking at 22 U.S.C. 1412, where we're talking about the least restrictive environment, which is sort of where this boils down to and what this dispute really centered on, was the IDEA strongly requires that students be mainstreamed unless education cannot be satisfactorily achieved in regular classes. And here there really isn't, regardless of whatever supplemental aids or services there may have been, he could not participate in the class itself. What they were proposing is what they did in elementary school, where he was physically in the class with other students, so he was exposed to them, but he had his own one-on-one tutoring in the back of the room doing his own lessons, which were not similar to what the rest of the class was doing. So West Hampton Beach said we're not going to—at one point there was discussion of a waiver, requesting a waiver from the Department of State for an experimental program. West Hampton Beach said we're not—there are great special education programs in all of these neighboring districts. You can go to Eastport, South Manor. You can go to South Hampton. There are the larger school districts have special education classes where you'd be integrated in a regular school and have your lunch and specials with typical students, but be with a class of students with similar needs, and to have one student in our school district that has these particular needs would be isolating. This was contentious, and they felt very strongly about this. The request that the parents were making involved a significant amount of time being pulled out into a resource room by himself with one-on-one tutoring. And the same thing—these appeals aren't about dependency placement, but that came up, and the school—the dependency placement was an agreed-upon stipulation that I understand Nicolauren sort of fires remorse about stipulating to that, but the school district of dependency could have said dependency is Eastport, South Manor, or dependency is South Hampton. You need to go to a special education class, and subject all of your rights to go through the administrative process and the federal courts, you need to attend a special education class, but they reached a compromise where he was tutored at the library for years. Once West Hampton created the class, or special education program, what is your response to your opponent's claim that at that point they could have admitted him? They couldn't—they weren't allowed to. The class that came up, the special education class that's being discussed, is there's students—I believe two of them came from West Hampton Beach's one elementary school, one middle school, and one high school. So its elementary school feeds into the higher level schools, and then other feeder schools come in. They had, I believe, two students in the same year in the elementary school that were coming up, so they knew they had these children that needed a special— it was a special education class that moved up with the students from the elementary school, all of whom were three years or more younger than Mr. Galore. So they were eventually compelled—the administrative process is informal and they have a lot of discretion in how they do things. So at one point they required multiple consultants to be hired, they required that a variance request be made, but they needed to have a variance granted by the Department of State to allow Aiden to attend that class in order to enroll him. Because of age only? Because of age only. When they actually—once the Department of State says, okay, we're waiving the age requirement, it's a black and white requirement, there can't be more than a three-year age gap, because you don't want 18-year-olds in class with 12-year-olds. You just generally don't want that. But based on unique circumstances, the Department of Education can waive that requirement. If that requirement is waived, then the CSE would look at all of the individualized factors and determine whether or not placement in that class, now that it's an available option, should be considered. And that's what happened here with the recent enrollment, which is not a— So you're saying that at the time that Mr. Killeran needed the accommodation, there wasn't enough of a critical mass to achieve the goals, but at a later point in time, by coincidence of timing, there were enough that you were able to go through the process, get a waiver, and create a program. It's a little more complicated than that. There was a waiver request that was made. The Killerans draft—they were given an opportunity— From the decisions, this is the first time anybody— These are multiple questions of first impressions through the state administrative process. But the initial waiver application was enough. The Killerans were given an opportunity. They need an educational justification. So the Killerans were given an opportunity to submit, not just the school district, but to submit an attachment to the Department of Education explaining why they think the waiver should be granted. And initially, the Department of Education denied it. I believe there may have been interim applications. Now, most recently, which is what Mr. Killeran was mentioning, for this year, they did grant that waiver, but you have unique circumstances because you have a student that has a dispute with the parents over placement, should not overrule all of these other considerations, but you have a dispute that has been going on for eight years. You have a student who is—the parents' preference for this one particular school district has become an issue, and looking at all of these factors, they made a discretionary judgment to grant the variance for this year. So typically, someone in Aiden's—Aiden's 20 years old— someone in his age group would be focused on lifestyle courses, which is what he was doing last year. They'd be going to—on Long Island, we call it BOCES— but he'd be doing—they'd be going to, like, not part-time jobs, but learning job skills. They'd be going to restaurants and other things, and out in the community doing practical things to transition into life after school. So generally, in his age group, that is what he'd be focused on most, if not all, of the day. Are you saying the waiver that was now granted that resulted in him attending the West Hampton school system under this special ed program is only a yearly waiver, so he'd have to file another waiver next year? Or did I mishear you? You said it was granted this— It was just granted—it was just granted for this year. I don't know the answer to that. I'm assuming granting it this year would allow him— the fact that he's going to be in the class would allow him to continue. But every year is a new CSE and a new IEP. So they're balancing a very, very unique situation where you have a student who really should— on paper, a 20-year-old student should be in these life skills programs. But you have someone who didn't go to middle and high school the way he could have, whether it be West Hampton Beach or East Ft. South Matter or any other school. When does he age out? So as I understand it, it's at age 21, right? Some states end services immediately upon the birthday of the young person. Other states continue the special education until the end of the academic year. What does New York do, if you know? I believe his birth date falls where he's only to turn 21 in the academic year, so he would have two years left. And I believe there's some discussion, because of COVID, of extending that just carte blanche across the board for one more year. So are you saying, then, that you're not certain that the waiver that has just been granted, that he's going to start in a week or two, may or may not be granted the following year? And if that's the case, what does that do to the mootness argument? Well, that's why it would be sort of moot regardless, because you can't order a 15-year-old to go into a middle school class because he's no longer a 15-year-old. Every year has to be based on his circumstances that year. So even with the waiver being granted, there's going to be a situation a year or two from now which hopefully this waiver, this should be a cooperative process, and it became a very adversarial process. So hopefully with him now being enrolled and getting into the special education class, it becomes a more cooperative process, but there will be some conflict between someone in his age group before he leaves high school, whether it's 21, 22, he should be doing these sort of life skills programs that they typically have for special education students. In his particular case, because of his unique circumstances, they sort of wound back the clock and let him go into a special education class with younger students who don't have the same goals because they're not transitioning out. As some of those students get older, they are going to be transitioning into both of these type programs. So year-to-year, the IEP is going to be changed, and standing here I can't predict in any way how that will. Hopefully it works out in a way that works great for everybody and they'll agree with, but I can't predict here what will happen next year or the year after. As far as the similarity issue, I referenced the age issue. The number is also a major concern, possibly even, I don't want to say more than the age, but the number of students is a going, when they created the special education class and decided we're going to create a new class and hire a teacher and establish a budget item for this, they had three students. With Mr. Kaloran, they had one student. So it's not just the fact that it was an age issue, it's the fact that the superintendent testified extensively on this, even three is low to create a class, but that at least exceeds the threshold. The idea of creating a class to meet the needs of one student, where you're not in rural Montana where it's 200 miles away to go to a school that has an available class, that isn't sound educational policy, based on the idea that public education is supposed to be group education. There is a value. If you look at the state regulations, really 200.6, 8 NYCRR 200.6, when you can't mainstream a student, the next step are these self-contained classes and the New York state regulations talk about group education and educating them in a group of students with similar needs. So when you're at the point where he can't, there's nothing we can do to have him meaningfully participate in a regular 8th grade class or even the class that had special education students, students with IEPs. The accommodations, and I'm using accommodation loosely, because I'm assuming this wasn't lost on the court, but an ADA accommodation and the IDEA, totally, totally different. The ADA is about access, that's a hearing aid, that's braille, you can get to the school, it's ramps, that's an accommodation. The IDEA is changing curriculum, which is, you can use the word accommodations if you're accommodating a special need, but it's not the same type of accommodation. It's someone coming up with a customized curriculum for a student, which is not an ADA issue. The school followed exactly the law it was supposed to follow. They looked for a group of students with similar needs where he could still be in a regular school district with other typically developed students and still have that experience as well. And they could not do that at West Hampton Beach, they could do it in neighboring school districts, but for the parents' very, very strong preference to go to this particular school, understandably they have an interest in, you mentioned socialization, he would have socialization in any school, but his friends that he grew up with and his siblings would be in this school. Is there anything in the IDEA that accounts for that in making a placement and development of an IEP? Not specifically in the IDEA, but in the state regulations, when the state defines a least restrictive environment, this is at 8 NYCR 200.1, they parrot 1412 of 22 U.S.C. with the can't be satisfactorily achieved language, and then they include three factors to look at in what constitutes the least restrictive environment. Number one is the special education needed by the student. That's the number one factor. Can you provide the education that's needed for the student? Number two is that they would be educated with their non-disabled peers to the maximum extent appropriate. And then number three is as close as possible to the student's home. So the idea of being in your local community is in there. It's not a parental preference. So the Colorans live virtually equidistant between Eastport, South Manor, and West Hampton Beach. Neither of their home districts. Yeah, neither of their home districts. So between that, it's a wash. And otherwise, they are looking at South Hampton. They were looking at other local districts. So that factored in, and it factors in as a practical matter, because the CSA is looking at everything. Every student has unique needs, and they're looking at unique factors. But as a matter of policy and principle, the school felt very strongly that their recommendation was appropriate. The initial recommendation was appropriate, and West Hampton Beach's recommendation that he attend a special education class with students in the same age range in a regular public school that just required going to a different public school, that was the appropriate recommendation. The factor weighing against that is really the parent preferences and their strong attachment to the school district, which the CSE considered and weighed, but that should not be the paramount consideration for the school district. And on that issue, that means we need to defer to the school district, and we need to defer to the administrative process and the SROs. Because when there were – sorry, I'm way over my time. I apologize. There were – Mr. Gloria mentioned the procedural violation, where they said that when they just adopted the original CSE – and there was an explanation. When we did depositions, there was an explanation for that, that it wasn't – they didn't just adopt it. They looked at it. They made sure it was appropriate, and then they adopted it. But when Justice – or IHO leader men sent that back, they got an abundance of procedural safeguards in place to make sure that this was very, very carefully looked at, and they really did make an informed, educated decision. It just wasn't the decision that the Glorians agreed with. So unless there's any further questions. Okay. Thank you so much. Thank you. Thank you. Go ahead. Thank you. Your Honors, my rebuttals have to start with just a fundamental factual inaccuracy. Aiden's Remsenburg CSE did not recommend ESM. Aiden's CSE recommended West Hampton. The only reason that there was a profile ESM recommendation was because there was a conveyance from West Hampton Beach to the CSE that they were not enrolling him. They were not accepting him. They were not even part of that CSE. Do you have a record citation? I mean, there was a bit of a struggle to work through a lot. If you actually look at IHO Lederman's decision, actually on the first page, and then there's other portions of it, it was always the recommendation of the CSE for Aiden to be placed at West Hampton Beach, but West Hampton Beach simply refused to do it. So you're saying on the first page of IHO Lederman's decision, that factual statement that you just made to the court can be found? There is, and there's also another portion of the decision that references it as well. Can I ask, is there any, in your mind, non-discriminatory reason that West Hampton could have declined him? Is there any acceptable reason? Yes, if there was a meaningful, a genuine meaningful analysis that took place, and if West Hampton Beach... So it's back to your procedural argument about the procedural violation. Well, and subsequently, but there's been statements by Mr. Kreppian today that, quite frankly, I find shocking, that an ultimately assessed student cannot be educated successfully in the general education class. This is done routinely throughout the country. In fact, in the seminal... I just want to, because your time is limited, I just want to focus the question. Is there any... Is your position that the procedural violation that allegedly occurred is at the basis for why you are saying that there was no viable or legitimate reason for declining? Correct, on the discrimination claims. But on the IDEA claims, there was still no meaningful analysis. Actually, the census data revealed that there was over 25 students who were being outsourced to different districts at that time. It wasn't just Aiden. There was 25 students being outsourced from grades K through 12 within the district. They had never educated a student who was ultimately assessed. Okay, thank you so much. We appreciate your time. We're going to see you guys in a bit. We are now calling... I thought we... Did we do it all again? I'm sorry, there's 20 minutes left. Right. Okay. We will then adjourn. Question and adjournment. Thank you. Thank you.